El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
Nos corresponde resolver si en un proceso de partición de herencia los tribunales de Puerto Rico están facultados, conforme al Art. 10 de nuestro Código Civil, 31 L.P.R.A. sec. 10, a adjudicar el título de unos bienes que están ubi-cados fuera de su jurisdicción territorial. Evaluada la con-troversia, concluimos que en Puerto Rico el derecho suce-soral está ensimismado en la corriente germánica cuando se suscitan controversias de conflictos de leyes aplicables, conforme a las enmiendas realizadas al Código Civil en 1902. En vista de los principios que subyacen en esta ver-tiente, resolvemos que en derecho sucesoral los tribunales de Puerto Rico no tienen jurisdicción para atender contro-versias acerca de la titularidad de bienes inmuebles sitos fuera de nuestra isla.
Por último, determinamos que en este caso procede, su-jeto al cumplimiento de las Reglas de Evidencia, que en el juicio se presente prueba de los actos realizados por los herederos previo al deceso del testador.
I
El Sr. Alfonso Valencia Jiménez falleció el 14 de marzo de 1994. Antes de su muerte, otorgó un testamento abierto en 1986 en el que distribuyó en porciones iguales la mayor *291 parte de su patrimonio entre sus dos hijos, Ginette Valencia Mercader y Wallace Valencia Mercader. En su testa-mento, el señor Valencia Jiménez designó a su hijo como el albacea y contador partidor de su caudal hereditario.
Al año siguiente del fallecimieñto del señor Valencia Ji-ménez, los hermanos Valencia Mercader otorgaron una pri-mera escritura de partición y adjudicación parcial de bie-nes hereditarios. Mediante esa escritura, hicieron la división y partición de algunos de los bienes de la herencia.
Posteriormente, la señora Valencia Mercader se percató de varias irregularidades que cometieron su hermano y el Ledo. Ramón García García en la distribución de los bienes del caudal de su padre. Tras reclamarles, los hermanos Valencia Mercader suscribieron un acta aclaratoria en 1996, mediante la cual subsanaron varios errores cometi-dos en la primera escritura. Además, hicieron constar que faltaban por distribuir a cada uno de ellos varios bienes del caudal hereditario. De igual forma, confirmaron que la se-ñora Valencia Mercader no conocía la totalidad de las pro-piedades y obligaciones del caudal de su padre. Constata-ron, además, que la señora Valencia Mercader no podía aceptar las cuentas del caudal porque no eran finales ni podía relevar a su hermano de toda responsabilidad en el ejercicio de su cargo como albacea y contador partidor hasta tanto se perfeccionara el cuaderno particional.
Sin embargo, antes de que finalizaran los trámites de la partición del caudal del señor Valencia Jiménez, el señor Valencia Mercader falleció. A este le sobrevivieron su es-posa, la Sra. Maeve Anne Sandiford y sus dos hijos, la Sra. Mary Constance Valencia Byrd y el Sr. Edmond Valencia Byrd.
Luego de la muerte de su hermano, la señora Valencia Mercader suscribió una carta a la viuda de su hermano. En esta le enfatizó la necesidad de aclarar y terminar los asuntos relacionados con la partición de la herencia de su padre antes de que ellos realizaran la partición de la suce- *292 sión de su hermano. A pesar de lo solicitado, la sucesión del señor Valencia Mercader firmó en 1999 una escritura de partición parcial, sin haberse finalizado la partición total de la sucesión del señor Valencia Jiménez.
Tras varios intentos extrajudiciales para que se reali-zara la partición final del caudal del señor Valencia Jimé-nez, el 13 de agosto de 2001 la señora Valencia Mercader y su esposo, el Sr. Rodolfo A. Catinchi, presentaron ante el Tribunal de Primera Instancia una demanda en daños y perjuicios y sobre partición final de herencia contra la se-ñora Maeve Anne Sandiford, los hermanos Valencia Byrd y el licenciado García García. Los hijos del señor Valencia Mercader no fueron incluidos hasta la presentación de la segunda demanda enmendada.
En esencia, alegaron que el señor Valencia Mercader efectuó negligentemente sus gestiones como albacea de la herencia de su padre. Asimismo, argüyeron que el señor Valencia Mercader y el licenciado García García, quien fue contratado por el primero para que lo asesorara en todo lo relacionado con la sucesión, hacían gestiones en secreto y de forma confidencial, y solo en ocasiones brindaban infor-mación sobre ellas a la señora Valencia Mercader. Aduje-ron, a su vez, que el señor Valencia Mercader no realizó de forma correcta y completa el inventario, la liquidación, la distribución y la partición final de la herencia. En particular, denunciaron que, a raíz de unas investigaciones reali-zadas, supieron que en el inventario del caudal relicto se omitieron bienes por distribuirse de la herencia de la suce-sión del señor Valencia Jiménez. Igualmente, alegaron que obtuvieron información que demostraba violaciones y valo-raciones incorrectas de las particiones, y adjudicaciones parciales de los bienes en perjuicio de la señora Valencia Mercader como heredera. Por último, señalaron que su-puestamente la señora Sandiford hizo caso omiso a los re-clamos para que la partición de la herencia del señor Valencia Jiménez se concluyera antes de proceder con la distribución del caudal de la herencia de su hermano.
*293 Posteriormente, la señora Anne Sandiford reconvino. En síntesis, manifestó que, a su juicio, la señora Valencia Mercader incumplió con su deber de distribuir los bienes inmuebles del caudal de su padre ubicados en la República Dominicana. Asimismo, alegó que su incumplimiento ha hecho que el caudal del señor Valencia Mercader incurra en costos contributivos sustanciales por supuestamente no informarlo a las autoridades fiscales correspondientes. Fi-nalmente, alegó que la señora Valencia Mercader recibió unos bienes ubicados en Bayamón y en Cupey en exceso de su participación.
Tras varios trámites procesales, el 30 de junio de 2008 la señora Valencia Mercader presentó una “Petición de or-den relativa a bienes pendientes por distribuir”. Apéndice de la Solicitud de certiorari, pág. 180. En esta recalcó que no se habían distribuido varios bienes del caudal heredita-rio de su padre. Nuevamente, alegó las gestiones infructuo-sas que realizó con la viuda de su hermano y sus sobrinos para completar la partición final del caudal de su padre. En cuanto a los bienes sitos en la República Dominicana, señaló que viajó a la isla vecina y constató que su padre era el alegado titular de unos terrenos en el sector Haina y de otro solar localizado en la provincia de Samaná. Argüyó, además, que tanto la señora Sandiford, como los hermanos Valencia Byrd, han manifestado falta de interés e inacción con relación a las tierras que se encuentran en la Repú-blica Dominicana.
Luego del intercambio de varias mociones, el Tribunal de Primera Instancia dictó una orden en la que dispuso que, conforme al Art. 10 del Código Civil, supra, todos los trámites legales y remedios concernientes a los bienes in-muebles ubicados fuera de Puerto Rico debían llevarse a cabo y solicitarse en la nación donde estén ubicados. A esos escritos le sucedió una sentencia parcial que dictó el Tribunal de Primera Instancia el 7 de enero de 2009. En ella, el foro primario declaró “con lugar” la desestimación de la *294 reconvención que presentaron la señora Sandiford y los hermanos Valencia Byrd. Cónsono con su dictamen anterior, desestimó toda causa de acción incluida en la recon-vención que se refiriera, se relacionara o resultara de las actuaciones de la señora Valencia Mercader sobre los ale-gados bienes inmuebles pertenecientes al caudal de su padre sitos fuera de nuestra jurisdicción.
Pasado otro intercambio de mociones, el Tribunal de Primera Instancia enmendó esa sentencia en dos ocasiones más. En la última, de 3 de marzo de 2009, desestimó toda causa de acción contenida en la demanda, en la demanda enmendada y en la reconvención que se relacionara con las actuaciones de la señora Valencia Mercader sobre los ale-gados bienes inmuebles pertenecientes al caudal de su padre sitos fuera de la Isla.
Por otra parte, durante el inicio del descubrimiento de prueba se suscitó otro sinnúmero de incidentes procesales. Entre estos estuvo la solicitud de la señora Valencia Mer-cader al tribunal para que se expidieran citaciones dirigi-das a varias instituciones financieras en las que su padre, hermano y cuñada tenían bienes. El Tribunal de Primera Instancia ordenó las citaciones, pero posteriormente para-lizó aquellas dirigidas a las cuentas bancarias de la señora Sandiford. El tribunal, a su vez, requirió a la señora Valencia Mercader que expusiera la pertinencia de los documen-tos solicitados. Esta explicó en su comparecencia que la falta de transparencia en el proceder de la señora Sandi-ford y de sus sobrinos ameritaba realizar un descubri-miento de prueba sobre los bienes recibidos entre 1991 y 2004, es decir, desde varios meses después de enfermarse el señor Valencia Jiménez y hasta varios meses después de fallecer. Atribuyó su necesidad al fin legítimo de determi-nar el paradero de los bienes que no fueron distribuidos o tomados en consideración al momento de valorar el caudal hereditario de su padre. La señora Sandiford se opuso a ese descubrimiento por entender que era irrelevante para *295 determinar los eventos ocurridos antes de la muerte del señor Valencia Jiménez.
En respuesta, el Tribunal de Primera Instancia concedió un término a la señora Valencia Mercader para que acre-ditara la pertinencia de pedir los estados de cuenta de la señora Sandiford correspondientes a fechas anteriores a la muerte del señor Valencia Jiménez. Asimismo, dispuso que los bienes muebles e inmuebles pertenecientes a las corpo-raciones no serían objeto de adjudicación en este caso por no formar parte del caudal hereditario. Sin embargo, dis-puso que el descubrimiento de prueba sobre dichos bienes sí era pertinente para determinar la existencia de dividen-dos y el valor de las acciones corporativas que forman parte del caudal.
Acontecido otro intercambio de mociones, el Tribunal de Primera Instancia emitió una nueva resolución y orden. En lo pertinente, dispuso:
Por otro lado, entendemos que la información requerida de la Sra. Maeve Anne Sandiford, es pertinente, particularmente en atención al Contrato de Compra venta de acciones suscrito por el Sr. Wallace Valencia y ella el 15 de abril de 1992, en un pleito donde se impugne la validez de dicho contrato y se soli-cite se decrete la nulidad de las actuaciones de Wallace Valencia y Maeve Anne Sandiford, tomando en consideración que al efectuarse dichas transacciones el Sr. Alfonso Valencia estaba vivo.

Sin embargo, el caso ante nuestra consideración es uno sobre complemento de herencia por alegada lesión y daños y perjui-cios y no uno de reivindicación de bienes, por alegadas actua-ciones fraudulentas de los accionistas u oficiales de las corporaciones. Por la propia naturaleza de la acción sucesoral radicada, el Tribunal, al momento de adjudicar, solamente puede tomar en consideración el caudal existente al momento del fallecimiento de Don Alfonso Valencia.

Cualquier controversia o reclamación sobre las actuaciones de accionistas u oficiales de las corporaciones deberá presen-tarse en el pleito corporativo correspondiente.

Por lo tanto, limitamos el descubrimiento de prueba sobre las cuentas de la Sra. Maeve Anne Sandiford al periodo que 
*296
comienza a raíz del fallecimiento de Don Alfonso Valencia. So-meta al Tribunal la parte demandante en 10 días nuevos pro-yectos de Orden de producción de documentos sobre las cuentas de Maeve Anne Sandiford, conforme los parámetros aquí señalados.

Hacemos extensiva esta Resolución al descubrimiento de prueba en su totalidad incluyendo las órdenes ya expedidas.

Añadimos que el Tribunal no permitirá el desfile de prueba durante el Juicio sobre transacciones o eventos ocurridos antes del fallecimiento del Sr. Alfonso Valencia.

... Por otro lado, enfatizamos una vez más que el presente litigio ante nuestra consideración es uno de complemento de herencia por alegada lesión y daños y perjuicios.

La posible acción de restitución de acciones contra la enti-dad o entidades corporativas que emitieron las acciones, debe radicarse y ventilarse en un pleito corporativo independiente. La partición y liquidación final del caudal dejado por el Sr. Alfonso Valencia se limitará a los bienes muebles e inmuebles existentes (éstos últimos ubicados en el Estado Libre Asociado de Puerto Rico) propiedad del Sr. Alfonso Valencia, al momento y no antes de su fallecimiento. (Énfasis en el original). Resolu-ción y Orden de 10 de septiembre de 2009, Apéndice de la Solicitud de certiorari, págs. 1432-1435.
Insatisfechos con esa determinación, el matrimonio Valencia-Catinchi presentó una moción de reconsideración que el tribunal acogió. Tras otro intercambio de mociones, reiteró su dictamen y denegó a la parte demandante des-cubrir y presentar prueba en el juicio sobre eventos o tran-sacciones anteriores al fallecimiento del señor Valencia Jiménez. De la misma forma, determinó que “[l]as alega-ciones de sustracción fraudulenta de bienes corporativos no son equivalentes a alegaciones (que no se han presen-tado en este caso) de donaciones hechas por el Sr. Valencia en vida, sujetas a colación”. (Enfasis suprimido). Orden de 19 de octubre de 2009, Apéndice de la Solicitud de certio-rari, pág. 1784.
El tribunal señaló que las partes estaban de acuerdo en cuanto a que los derechos hereditarios recaían sobre la to-talidad del caudal hereditario. Por consiguiente, si en su *297 día se probara que los inmuebles sitos en la República Do-minicana pertenecían al señor Valencia Jiménez, el Tribunal de Primera Instancia tendría la potestad de incluirlos como parte del caudal. Ahora bien, amparándose en el Art. 10 del Código Civil, supra, y en Bracons v. Registrador de San Juan, 24 D.P.R. 753 (1917), el tribunal reiteró que la adjudicación de dichos derechos y la liquidación de los bie-nes inmuebles sitos en el extranjero deben ser efectuadas en el Tribunal del país donde se encuentran situados.
Insatisfechos una vez más, los esposos Valencia-Catin-chi presentaron un recurso de certiorari ante el Tribunal de Apelaciones. En esencia, plantearon que erró el foro pri-mario cuando les impidió descubrir y presentar prueba so-bre la reducción del patrimonio del señor Valencia Jiménez previo a su deceso, producto de los actos del señor Valencia Mercader y los demás codemandados. Sostuvieron, ade-más, que el señor Valencia Mercader obtuvo un adelanto de su herencia al beneficiarse económicamente de dichos actos. Así, argumentaron que aplica la doctrina de colación y que, por lo tanto, procede adjudicar al señor Valencia Mercader el valor de los bienes alegadamente sustraídos del caudal hereditario antes del fallecimiento de su padre como adelanto de su herencia.
Como segundo error, indicaron que el Tribunal de Pri-mera Instancia falló al resolver que la liquidación, parti-ción y adjudicación de los alegados bienes inmuebles del caudal del señor Valencia Jiménez sitos en la República Dominicana tiene que hacerse por un tribunal del país ve-cino y no por nuestros tribunales. Indicaron que, una vez se determine que el señor Valencia Jiménez era el dueño de esos inmuebles, procedía que el Tribunal de Primera Instancia resolviera que estos forman parte de la masa universal hereditaria e hiciera la debida partición y adju-dicación final entre sus herederos.
El Tribunal de Apelaciones modificó la resolución y or-den del foro primario. De esta forma, permitió un descubrí- *298 miento de prueba que fuera “amplio y liberal de todos los asuntos que puedan tener cualquier relación posible con la materia que es objeto del pleito, aunque no estén relacio-nados con las controversias específicas que fueron indica-das en las alegaciones”. Sentencia del Tribunal de Apela-ciones, pág. 23, Apéndice de la Solicitud de certiorari, pág. 1955. Sobre los bienes inmuebles ubicados en la República Dominicana, indicó que, conforme al Art. 10 del Código Civil, supra, y lo resuelto por esta Curia en Hecht v. Hecht et al., 12 D.P.R. 227 (1907), el Tribunal de Primera Instancia no erró al resolver que no realizaría la adjudicación ni la liquidación de estos bienes. Concluyó que eso le corres-ponde al tribunal del país donde estén localizados los inmuebles.
Inconformes otra vez, el matrimonio Valencia-Catinchi recurre ante nos. Como primer señalamiento de error, im-putan error al foro apelativo intermedio por haber confir-mado que la liquidación, partición y adjudicación de los bienes inmuebles del caudal relicto del señor Valencia Ji-ménez sitos en la República Dominicana tiene que hacerla un tribunal de ese país y no el Tribunal de Primera Instancia. Como segundo error, alegan que incidió el Tribunal de Apelaciones al no revocar aquella parte de la re-solución y orden del Tribunal de Primera Instancia que impidió el desfile de prueba sobre transacciones o eventos ocurridos antes del fallecimiento del señor Valencia Jiménez. Aducen que el Tribunal de Apelaciones “abre una puerta al descubrimiento, pero mantiene cerrada la puerta a la evidencia que se obtenga mediante tal descubri-miento”. Solicitud de certiorari, pág. 18.
El 8 de abril de 2011 expedimos el auto. En cumpli-miento con nuestra orden, las partes presentaron sus res-pectivos alegatos. Con el beneficio de ambos, procedemos a resolver.
*299 II
En su alegato ante este Tribunal, el matrimonio Valencia-Catinchi arguye que, conforme a lo que resolvimos hace más de 100 años en Hecht v. Hecht et al., supra,
... no debe quedar duda de que la herencia de don Alfonso constituye una sola masa hereditaria, independientemente de donde estén sitos los bienes que la integran o de su naturaleza real o personal. Tampoco debe nadie dudar que, a los fines particionales, la herencia no debe segmentarse, es decir, frag-mentarse entre diversos foros judiciales. Solicitud de certiorari, págs. 12-13.
Hace poco más de dos años tuvimos la oportunidad de definir el derecho internacional privado en Ramírez Sainz v. S.L.G. Cabanillas, 177 D.P.R. 1, 11 (2009). Allí, expresamos que
... [e]l derecho internacional privado es la disciplina que es-tudia y explica las leyes que aplican a una controversia entre personas de ciudadanía o domicilio diferente, o, en general, a casos vinculados a más de un estado y determina cuál foro judicial debe resolver esos casos. También establece el proce-dimiento para reconocer un acto realizado en un territorio con jurisdicción separada o una sentencia dictada por un tribunal extranjero. (Escolios omitidos).
El derecho internacional privado, al igual que muchas otras ramas jurídicas, se extiende hacia otras áreas del Derecho. Por esa razón, nunca encontraremos una definición única, pues carece de unos contornos perfectamente delimitados, “de nociones precisas, de límites exactos, en una palabra[,] de verdades definitivas”. D. Guzmán Latorre, Tratado de derecho internacional privado, 3ra ed., Santiago de Chile, Editorial Jurídica de Chile, 1997, citando a A. Miaja de la Muela, Derecho internacional privado, Madrid, Eds. Atlas, T. I, pág. 9. Por ejemplo, para Brocher, el derecho internacional privado “debe prevenir o resolver de un modo conveniente los conflictos que puedan *300 surgir entre las legislaciones que emanan de diferentes soberanías”. D. Guzmán Latorre y M. Millán Simpfendór-fer, Curso de derecho internacional privado, Santiago de Chile, Editorial Jurídica de Chile, pág. 15. Por su parte, Carlos Esplugues Mota, lo define como la rama del derecho que atiende
... la regulación de las relaciones y situaciones privadas de carácter internacional generada entre particulares, o sujetos que no siéndolo actúen como tales. Su finalidad es aportar una respuesta adecuada y justa a los problemas a que ellos se ven expuestos como consecuencia de la existencia de una plurali-dad de ordenamientos jurídicos independientes, que al parecer vinculados a una concreta relación o situación jurídica resul-tan potencialmente reguladores de la misma. C. Esplugues y J.L. Iglesias Buhigues, Derecho internacional privado, 5ta ed., Valencia, Ed. Tirant lo Blanch, 2011, págs. 59-60. Véase, además, J.E. Dávila Rivera, Interacción entre el derecho internacional privado y el derecho de sucesiones, 44 Rev. Jur. U.I.A. 1, 4 (2011).
Por último, para el chileno Diego Guzmán Latorre
... el Derecho Internacional Privado es la rama del derecho internacional de cada país que tiene por objeto fijar la nacio-nalidad de los individuos, determinar los derechos de que go-zan los extranjeros, resolver los conflictos de leyes referentes al nacimiento, a la modificación, a la transformación o a la extinción de los derechos adquiridos y resolver, por último, los conflictos de jurisdicción que puedan surgir entre estados in-dependientes o entre Estados componentes de un Estado Federal. Guzmán Latorre y Millán Simpfendorfer, Curso de derecho internacional privado, op. cit., pág. 17.
La globalización ha hecho que “Puerto Rico dej [ara] de ser hace mucho tiempo una comunidad provincial que vivía de espaldas a los intercambios internacionales, al turismo, a la emigración, en fin, a la dimensión mundial de los negocios”. E. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, 59 Rev. Jur. U.P.R. 557 (1990). El derecho internacional se ha asentado
*301 ... como la disciplina que reglamenta la convivencia entre los pueblos, en una amplia dimensión... La razón para esta evolución es sencilla. El estado como institución, como orga-nismo, se ha quedado pequeño. El desborde de su jurisdicción se hace inminente, producto entre otras razones de los adelan-tos tecnológicos y de la explosión poblacional. R. Aponte Toro, El derecho internacional en la educación del jurista puertorri-queño, 60 Rev. Jur. U.P.R. 81, 82 (1991).
Por eso, “en la actualidad resulta común que personas extranjeras, domiciliadas o no en Puerto Rico, hagan inversiones en la Isla que pueden conllevar la adquisición de bienes inmuebles, de bienes muebles o de ambos”. Id. De la misma forma, es común que puertorriqueños adquieran bienes muebles e inmuebles en países extranjeros o en otras jurisdicciones de Estados Unidos. Como consecuencia de lo anterior, son múltiples las controversias jurídicas que se pueden suscitar cuando fallece una persona que adquirió bienes en distintas jurisdicciones. Dávila Rivera, supra, pág. 2. Así pues, es certera la afirmación del profesor Pierre Lalive de que “no siempre es suficiente atravesar la frontera para escapar al [sic] efecto de las leyes de [un] país o para beneficiarse con las facilidades ofrecidas, sobre tal o cual punto, por una ley extranjera”. A. Boggiano, Derecho internacional Privado, 2da ed., Buenos Aires, Eds. Depalma, 1983, pág. 1, citando a Pierre Lalive, Tendances et méthodes en droit international privé (Cours general), “Recueil des Cours de TAcademie de Droit International de La Haye”, 1977-11-155, pág. 15.
La profesora Enid Martínez Moya explica que “[l]os es-tatutos que pretenden resolver los conflictos de ley en el ámbito del Derecho Sucesoral pertenecen a uno de dos sis-temas: el romano o el germánico”. (Escolios omitidos). Martínez Moya, supra, págs. 559-560. Ante esa realidad, surge la necesidad de analizar la letra de nuestro ordenamiento jurídico sobre derecho internacional privado en el campo del derecho sucesoral para conocer si es el sistema romano *302 o el germánico el que regirá las sucesiones cuando el cau-sante deja bienes en la Isla y en otra jurisdicción.
Como se sabe, “[e]n la actualidad, los problemas que se generan en nuestra jurisdicción en materia de derecho internacional privado son atendidos por los Arts. 9 (estatuto personal), 31 L.P.R.A. sec. 9, el Art. 10 (estatuto real) y el Art. 11 (estatuto formal) del Código Civil de Puerto Rico”, 31 L.P.R.A. secs. 9, 10 y 11. Roselló Puig v. Rodríguez Cruz, 183 D.P.R. 81, 98 (2011). Específicamente, si de bienes se trata, el Art. 10 del Código Civil, supra, es el que rige la controversia. Claro, ello está sujeto a las excepciones establecidas en el Art. 11 del Código Civil de Puerto Rico, supra. Estas excepciones limitan las actuaciones que se realizan fuera de Puerto Rico cuando estas actuaciones están vedadas por nuestras leyes o contravienen el orden público.
Por regla general, se espera que el estatuto sucesoral refleje la visión que el ordenamiento interno de un país tiene sobre la sucesión. Martínez Moya, supra, pág. 560. “Se trata, pues, de dos niveles —el internacional y el interno— en cada uno de los cuales se manifiesta una noción específica del significado y alcance de la sucesión”. Id. Por consiguiente, se espera que el nivel interno e internacional coincidan, de manera “que un ordenamiento que tenga la visión romana de lo que es la sucesión adopte un estatuto de conflicto de leyes que responda precisamente a esa concepción”. íd. Sin embargo, en Puerto Rico no ocurre así. Si observamos la definición de la herencia que nos brinda el Art. 608 del Código Civil, 31 L.P.R.A. sec. 2090,(1) notaremos que nuestro ordenamiento sucesoral interno preceptúa la sucesión conforme al modelo romano. Sin embargo, el Art. 10 del Código Civil, supra, que es el que *303 atiende los conflictos que se generan en el campo del dere-cho internacional privado cuando de bienes muebles e in-muebles se trata, es de corte germánico. Íd.
Con el propósito de entender mejor ambos sistemas, analicemos algunas de sus características más sobresa-lientes.
III
A. Tradición romana
Los países que en sus estatutos sobre derecho internacional privado siguen la tradición romana, “visualizan] la herencia ‘como una unidad ideal, como una universalidad jurídica cualesquiera que sean la naturaleza de los bienes que la constituyen y los países en que estén situados; y considerando todos los bienes como si formasen una sola masa patrimonial...’ ”. Martínez Moya, supra, pág. 561, citando a V.P. Fiore, Derecho internacional privado o principios para resolver los conflictos entre las leyes de los diversos estados, Madrid, 1903, pág. 70. De ahí que, “constituyendo la sucesión la continuación de la persona del difunto, debe ella regirse por la ley personal del causante”. Guzmán Latorre y Millán Simpfendórfer, op. cit., pág. 824. Para algunos sistemas, será “la nacionalidad del causante antes de morir; y para otros,... su último domicilio”. (Enfasis suprimido). Martínez Moya, supra, pág. 562. Observemos que, según este sistema, se concibe la sucesión como “una universalidad que comprende la totalidad del patrimonio del causante”. íd., págs. 561-562. Al clasificarse como tal, es un objeto ideal y, en ese sentido,
... la lógica conduce forzosamente a aplicar una sola ley a lo que por su naturaleza es una unidad, a lo que no puede divi-dirse sin destruirse esa unidad, y respecto de la cual no cabe, por tanto, considerar aisladamente cada uno de los elementos que la componen. Id.
En síntesis, según el sistema romano, a la universalidad *304 compuesta por todos los bienes del causante le aplica una sola ley. Al ser así, no pueden considerarse aisladamente cada uno de los bienes que componen la herencia porque, al hacerlo, inevitablemente se destruye la unidad de la que está compuesta. Por ello, cuando ese es el sistema que rige en un país,
... un tribunal que tenga que dirimir una controversia de índole sucesoral en situaciones en que un ciudadano o domici-liado de otra nación haya dejado bienes, del tipo que sea, en el territorio sujeto a su jurisdicción, tendrá que considerarlos, conjuntamente con los ubicados en otros lugares, como una masa única e ideal a la que habrá de aplicar una sola ley que podría ser, según sea el caso, la ley sucesoral de la nación del causante o la de su domicilio. Íd., pág. 563.
B. Tradición germánica
El sistema germánico, contrario al romano, concibe “la herencia como un fenómeno de atribución de un patrimonio de bienes, que lleva implícita no la unidad sucesoria sino la pluralidad de masas hereditarias”. Íd., pág. 564, citando a M. Aguilar Navarro, Derecho Civil internacional, Madrid, 1973, págs. 527-529. “Los regímenes cuyos ordenamientos internos siguen esta tendencia ven en la sucesión, ‘no la sustitución de la persona del causante, sino la atribución de la titularidad sobre un patrimonio dentro de un proceso dinámico cuyo objeto y centro de gravedad lo forman los bienes’ ”. Íd., pág. 564, citando a 2 J.D. González Campos, Derecho internacional privado, Oviedo, 1984, pág. 241. Por consiguiente, cuando los bienes que dejó el causante estén situados en distintas jurisdicciones, “el patrimonio del causante qued[a] dividido en tantas masas sucesorias como leyes [diferentes e] independientes entre sí aunque proced[a]n del mismo titular”. Íd., citando a 2 M. Aguilar Navarro, Derecho Civil internacional, Madrid, 1975, pág. 732.
En los países donde impera la corriente germánica, exis-ten dos normas que regulan los problemas de derecho in- *305 ternacional privado. Íd. La primera de ellas se caracteriza por aplicar la lex situs a todos los bienes, independiente-mente de su naturaleza mueble o inmueble. La segunda aplica únicamente la lex situs a los inmuebles, y la ley de la nacionalidad del causante o la de su domicilio a los bienes muebles. Íd.
Como vemos, la corriente germánica “produce una plu-ralidad de sucesiones cuando los bienes están situados en diversos países”. Guzmán Latorre y Millán Simpfendorfer, op. cit., pág. 824. Esto significa que cada sucesión se rige por una ley distinta que dependerá del lugar donde estén sitos los bienes. Martínez Moya, supra, pág. 564. Como consecuencia, la legítima de los herederos se computará “según el ordenamiento que rija en el Estado donde están localizados los bienes haciéndose total abstracción de los bienes dejados en otra parte”. Íd., pág. 564.
La comunidad internacional ha manifestado “un mayor endoso” al sistema romano-unitario. Martínez Moya, supra, pág. 565. Esto responde a que esa regla “presenta la enorme ventaja de conservar la unidad de la sucesión”. Guzmán Latorre y Millán Simpfendorfer, op. cit., pág. 824. Por eso, la profesora Martínez Moya entiende “que nuestro Código pide a gritos una reforma, como resultado de la cual debe adoptarse un estatuto que incorpore el sistema romano universalista que es el que está a tono con nuestra percepción del fenómeno sucesoral”. E. Martínez Moya, El derecho sucesorio puertorriqueño, 67 Rev. Jur. U.P.R. 1, 88 (1998). Propone que “[e]l caudal hereditario [se vea] como una masa única, independientemente de la naturaleza mueble o inmueble de los bienes y del lugar de su ubicación, a la que tendrá que aplicársele una sola ley que podría ser la de la nacionalidad o la del domicilio del causante”. Íd. Claro está, reconoce que la Asamblea Legislativa tiene la última palabra. Íd. Así considera que, estemos o no de acuerdo, nuestro estatuto sucesoral de conflicto de leyes pertenece a la corriente germá- *306 nica fragmentarista. Por ello, cuando muere una persona domiciliada en el exterior, se entenderá que el caudal queda dividido en varias masas de bienes dependiendo de los distintos lugares donde haya inmuebles. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 594. Cada una de esas masas estaría controlada por la lex situs. Id. Sin embargo, la pro-fesora Martínez Moya no analizó cómo armonizar la regla romano-unitaria con los conflictos que surgen en un sis-tema federal de jurisdicciones independientes entre sí, como el que vivimos.
Por su parte, los favorecedores del sistema germánico entienden que esta corriente garantiza el respeto a la so-beranía nacional al impedir que bienes localizados en un país sean regidos por una legislación extranjera. Afirman también que esto es una defensa del orden público de cada país.
Con este resumen de las características de ambos siste-mas, pasemos a analizar el historial legislativo antecede al Art. 10 del Código Civil, supra.
IV
En nuestra jurisdicción, el Art. 10 del Código Civil, supra, dispone que “[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos”. Véase Roselló Puig v. Rodríguez Cruz, supra, pág. 91 esc. 11. Véase, además, Sucn. Evans v. Srio. de Hacienda, 108 D.P.R. 713 (1979).
Antes de las reformas al Código Civil en 1902, nuestro Art. 10, supra, leía como sigue:
Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles a las leyes del país donde están sitos.
Sin embargo, las sucesiones legítimas y las testamentarias, así respecto al orden de suceder como a la cuantía de los de-rechos sucesorios y a la validez intrínseca de sus disposicio- *307 nes, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren.
Los vizcaínos, aunque residan en las villas, seguirán some-tidos, en cuanto a los bienes que posean en la tierra llana, a la ley 15, tit. 20, del Fuero Vizcaya. Bracons v. Registrador de San Juan, supra, pág. 756.
La Comisión Codificadora que preparó el proyecto del Código Civil Revisado catalogó el cambio al Art. 10 del Có-digo Civil, supra, como una de las reformas más importan-tes al Título Preliminar de ese cuerpo legal. Bracons v. Registrador de San Juan, supra, pág. 757. Su propósito fue
"... restringir la doctrina de los estatutos personal y real, to-mando en cuenta y aplicando el principio general del derecho civil americano de que los derechos respecto de los bienes in-muebles han de regularse totalmente, así en cuanto a la con-tratación como en cuanto a los derechos hereditarios, por la ley del país en que están sitos”. Bracons v. Registrador de San Juan, supra, pág. 757.
Nótese que el cambio consistió en la supresión de “la excepción contenida en el artículo concordante del Código Español respecto al caso de sucesión hereditaria”. L. Mu-ñoz Morales, Reseña histórica y anotaciones al Código Civil de Puerto Rico, Río Piedras, Junta Editora de la Universi-dad de Puerto Rico, 1947, pág. 25.(2) Lo anterior “tuvo el *308 efecto de colocar nuestro estatuto sucesoral de conflicto de leyes dentro de la vertiente germánico pluralista, específi-camente la de Estados Unidos”. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 578. Lo mismo expresó la Comisión Codifica-dora al explicar que era “ ‘indudable que la mente del Con-greso [con relación al criterio que utilizó para ordenar la revisión] fué [sic] poner las instituciones de la isla en más estrecha harmonía [sic] con el sistema americano...’ ”. Mu-ñoz Morales, op. cit., pág. 23. Por eso, “se notó bastante en este Código [de 1902] la influencia del Criterio Norteame-ricano, porque no sólo se hicieron aquellas modificaciones que naturalmente exigía el cambio de régimen, sino que se intercalaron artículos del Código de Louisiana, e introdu-jeron otras doctrinas radicalmente opuestas a nuestro his-tórico Derecho Civil...”. íd. Por ello, “[c]ualquier comenta-rio que se haga en torno al alcance del Artículo 10 debe estar precedido de un examen de la regla norteamericana en el ámbito sucesoral de conflicto de leyes”. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 578.
En la reciente decisión S.L.G. Rodríguez-Rivera v. Bahía Park, 180 D.P.R. 340, 369 (2010), reafirmamos que “Puerto Rico tiene un sistema legal mixto”. Véase, además, J. Trías Monge, The Structure of the American Legal System — Its Sources, Forms and Theory of Law, 51 Rev. Jur. U.P.R. 11, 16 (1982). Explicamos que “[e]ste híbrido es el resultado exitoso de la interacción centenaria de principios legales, casuística, leyes y códigos provenientes tanto del derecho civil español como del derecho consuetudinario (icommon law) estadounidense”. S.L.G. Rodríguez-Rivera v. Bahía Park, supra, pág. 369. A raíz de ello, ya hemos adoptado “ ‘doctrinas y normas de interpretación del common *309 law cuando las hemos considerado acertadas y enriquece-doras de nuestro Derecho’ Íd., citando & Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 169 (1994). Ahora bien, su adopción no debe hacerse a la ligera. “Lo crucial es que lo hagamos con la reflexión y corrección debida, para que no desnaturalicemos los principios de derecho civilistas y del derecho consuetudinario que constituyen parte fundamental de nuestro ordenamiento legal autóctono y que, en con-junto, en sus ámbitos respectivos, conforman el derecho puertorriqueño contemporáneo”. Íd.
A. Conflicto de leyes en el ámbito sucesoral estadounidense
En Estados Unidos impera la norma general de que los bienes inmuebles se rigen por la ley del estado en que estén sitos, mientras que los bienes muebles se gobernarán por la ley del último domicilio del causante. R.J. Weintraub, Commentary on the Conflict of Law, 6ta ed., Nueva York, Thomson Reuters/Foundation Press, 2010, Cap. 8, pág. 573. Véase, además, Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 579. En otras palabras, los bienes inmuebles se regirán por la ley del lugar donde estos se ubican (situs). Esta norma está fuertemente arraigada en el acervo jurídico estadounidense desde hace más de un siglo. Desde 1900, el Tribunal Supremo de Estados Unidos expresó en Clarke v. Clarke, 178 U.S. 186, 190 (1900): “It is a doctrine firmly established that the law of a State in which land is situated controls and governs its transmission by will or its passage in case of intestacy”. Véanse, además: Fall v. Eastin, 215 U.S. 1 (1909) (donde el Tribunal Supremo de Estados Unidos reiteró la doctrina de que los tribunales de otros estados no tienen jurisdicción para entender en controversias sobre inmuebles ubicados fuera de su territorio); De Vaughn v. Hutchinson, 165 U.S. 566, 570 (1897) (“It is a principle firmly established that to the law of the State in which the land is situated we must look for the rules which *310 govern its descent, alienation and transfer, and for the effect and construction of wills and other conveyances”).
El First Restatement on Conflict of Laws reiteró el prin-cipio básico de la regla del situs, al establecer que su ley gobernará todo lo relacionado con los bienes inmuebles. A.P. Dwyer II, The Situs Rule, 4 Conn. Prob. L.J. 325, 330 (1989). La ley del situs es uno de los principios de derecho del First Restatement más abarcador hasta el momento; mantiene hoy la mayoría de su autoridad, a pesar de que muchos tribunales han abandonado los principios del First Restatement en otras áreas. Matter of Estate of Reed, 768 P.2d 566 (Wyo. 1989); Manderson & Associates, Inc. v. Gore, 389 S.E.2d 251 (1989). Como vemos, hay todavía un área de derecho internacional privado en la que las ideas del First Restatement prevalecen: las interrogantes que in-volucren bienes inmuebles se determinarán por la ley del situs. Esa era la postura del First Restatement, es la posi-ción esencial del Second Restatement y es la regla en la jurisprudencia contemporánea. Véase Dwyer II, supra, págs. 330-332; R. Alden, Modernizing the Situs Rule for Real Property Conflicts, 65 Tex. L. Rev. 585, 587 y 589-591 (1987).
Los profesores McDougal, Felix y Whitten opinan lo mismo al revelar que la norma prevaleciente en los estados es la siguiente:
If a decedent at death own interest in land..., the land descends to heirs or others according to the entire law, including the conflicts law, of the place where the land is located. If the decedent leaves land in more than one state, each portion of the land descends according to the whole law of its separate situs, regardless of the manner of descent of other portions of the land elsewhere situated. The law of the decedent’s domicile is irrelevant, unless the conflicts law of the situs refers some question to it. L.L. McDougal III, R.L. Felix y R.U. Whitten, American Conflicts Law, 5ta ed., Nueva York, Transnational Publishers, 2001, pág. 649.
El Juez Asociado Joseph Story recopiló en 1865, por pri- *311 mera vez, de forma coherente y organizada, las normas de conflictos de leyes en Estados Unidos en su famoso tratado Commentaries on the Conflict of Laws. Véase Alden, supra, pág. 587. Descansó en las leyes romanas y europeas para la preparación de este tratado, según esbozadas por juris-tas de ese continente y, especialmente, por el common law inglés. Íd.
En las controversias que involucraban tierras, los abo-gados y las cortes inglesas asumían que la ley inglesa gobernaba. Por eso su jurisprudencia contiene muy poca discusión sobre la norma del situs. Alden, supra, pág. 588. Esa suposición no sorprende, pues Inglaterra no estaba dividida en estados soberanos y sus tribunales se abstenían de considerar casos que requerían la aplicación de leyes extranjeras. Íd. La distribución histórica de poder entre los tribunales del common law inglés —que tenían jurisdic-ción exclusiva sobre el título de las tierras en Inglaterra— y las cortes eclesiásticas —que actuaban conforme a equi-dad— también afectó las leyes sobre la propiedad inmueble. Id. La manera celosa como los tribunales del common law inglés guardaban su jurisdicción sobre la pro-piedad inmueble los indispuso para aplicar cualquier otra ley que no fuera la suya en asuntos que involucraran tierras. íd.
A igual conclusión arriba Rafael A. Mirabal Conde en su tesis de derecho. R. Mirabal Conde, La regla “lex rei sitae” en la doctrina puertorriqueña de conflicto de leyes, 30 Rev. Jur. U.P.R. 57, 60-61 (1961). Explica que “[t]oda la doc-trina, la jurisprudencia y la legislación norteamericana, con ligeras variaciones, ha seguido la doctrina territorial”, Íd., pág. 61.
Es esta doctrina mayormente el resultado de la búsqueda de principios razonables y viables necesarios para implementar las relaciones jurídicas de una nación en dinámico creci-miento...
Story, en una de las más reveladores exposiciones de su pen- *312 samiento, opina que, independientemente de las dificultades que confrontan los juristas continentales europeos que sostie-nen la validez del estatuto real, hay ciertas excepciones prác-ticas a la posición de esos juristas que sacuden los fundamen-tos de la tesis que sustentan. Cree más fácil buscar la simplicidad en los sistemas que tratar de reconciliarlos con los deberes e intereses de todas las naciones en todos los casos.
Story, como vemos, parte del principio que las leyes no pue-den aplicarse extraterritorialmente y que es bizantina cual-quier discusión que pretenda darle tal vigencia a la ley del país. (Escolios omitidos). íd., págs. 60-61.
Sobre la verdadera razón de esta regla mencionamos también en Colón et al. v. El Registrador, 22 D.P.R. 369, 373-374 (1915), haciéndonos eco de las expresiones del profesor Raleigh Minor, que
“[p]uesto que la propiedad inmueble radica para siempre en el Estado en que se encuentra y como ningún otro Estado puede tener jurisdicción sobre la misma se deduce necesariamente que no puede adquirirse en definitiva ningún derecho, título o interés sobre ella a no ser que sea consentido por las cortes de ese Estado de acuerdo con sus leyes. Las cortes de ningún otro Estado pueden resolver en definitiva tales cuestiones de modo que confieran o priven a un litigante de un derecho a la propiedad. Por otra parte, las cortes del lugar donde radica la propiedad deberán ser estrictamente rigurosas en exigir que se cumpla con la ley del sitio en que se encuentra dicha pro-piedad en lo que respecta al traspaso del título a esa clase de propiedad. Las prácticas (policies) de cada Estado con respecto a traspasos de bienes inmuebles comprendidos en sus límites están consideradas justamente entre las más importantes de todas sus prácticas con respecto a las cuales no se tolerará ninguna intromisión extraña. Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan a la entrega, traspaso y gravamen de bienes inmuebles situados dentro de sus límites sean lo más terminantes y precisas posibles. Se exigen formalidades especiales que no se requieren en otras cuestiones. Y es sumamente importante que las inscripciones legales de dichas transacciones las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.
Ni pretenderán las cortes de otros Estados hacer valer sus propias leyes relativas a los bienes inmuebles situados en *313 otras partes..., principalmente por la absoluta imposibilidad en que se encuentran para dictar cualquier sentencia o de-creto que sea definitivo y eficaz para traspasar cualquier de-recho sobre el inmueble... Viene, pues, a ser un principio bien establecido de derecho internacional privado, sostenido por un fuerte núcleo de autoridades, que todas las cuestiones relati-vas a traspasos de título sobre bienes donde quiera que surjan se regirán por la lex situs, o sea por la ley del tribunal en que finalmente deban ser resueltas en definitiva todas esas cuestiones”.
Posteriormente, como señalamos, el Restatement on Conflict of Laws solidificó la postura absolutista del common law. Por eso refería todas las controversias sobre bienes inmuebles a la ley del sitio. Alden, supra, pág. 589. Ahora bien, la regla del situs no solo controla la ley a apli-carse, sino también la jurisdicción de los tribunales para entender en controversias que comprendan bienes inmue-bles fuera de su jurisdicción. Es decir, la norma prevale-ciente en Estados Unidos es que un tribunal no tiene juris-dicción para ver un caso en que la controversia sea sobre un bien inmueble localizado fuera de su jurisdicción, aun-que el tribunal aplique la ley del sitio en que el inmueble se encuentre localizado. Id., pág. 590. (“Even if a nonsitus court... applied the law of the situs, a decree affecting title extrastate land would still be void for want of jurisdiction”).
Robby Alden opina que con las decisiones del Tribunal Supremo de Estados Unidos en Clarke v. Clarke, supra, y Fall v. Eastin, supra, la fórmula de conflicto de leyes adop-tada en su tratado por el Juez Story se convirtió en una regla firmemente establecida para la jurisdicción de los tribunales. Precisamente, los pronunciamientos en Pennoyer v. Neff, 95 U.S. 714 (1877), que estableció que la juris-dicción de un tribunal no se extendía más allá de las fron-teras de su estado, afianzaron aún más esa norma. Dada la preminencia de la teoría del poder territorial para la juris-dicción, era de esperarse que el Tribunal Supremo de Es-tados Unidos concluyera que un tribunal carecía de juris- *314 dicción en controversias sobre tierras extraterritoriales. A la luz de esa postura, solo un tribunal del sitio tiene poder sobre sus fronteras. Por esa razón, en Clarke v. Clarke, supra, y Fall v. Einstein, supra, se relevó a los tribunales del situs de la obligación de otorgar entera fe y crédito a los decretos de los tribunales de otros estados. Art. IV, Sec. 1, Const. EE. UU. L.P.R.A., Tomo 1.
Desde Fall v. Eastin, supra, el Tribunal Supremo de Es-tados Unidos ha hecho poco para dispersar la noción de que solo los tribunales del situs tienen jurisdicción sobre la materia para afectar el título sobre las tierras. Weintraub, op. cit., pág. 582. En 1963, el Tribunal Supremo de Estados Unidos determinó en el caso Durfee v. Duke, 375 U.S. 106 (1963), que se le debe dar entera fe y crédito al hallazgo jurisdiccional de que la tierra está dentro del estado adjudicador. Íd. Al concluir así, el Juez Asociado Stuart expresó que el estado de Nebraska solo tendría jurisdicción sobre la materia si la tierra en controversia estaba en Nebraska. Durfee v. Duke, supra, págs. 582-583. Véanse, además: Rozan v. Rozan, 129 N.W.2d 694 (N.D.1964); McRary v. Mc Rary, 47 S.E.2d 27 (N.C.1948); Burton-Lingo Co. v. Patton, 107 P. 679 (1910); Cortney v. Henry, 114 Ill.App. 635 (1904).
A igual conclusión llegó en 1998 el Tribunal Supremo federal, por voz de la Jueza Asociada Ginsburg, en Baker v. General Motors Corp., 522 U.S. 222 (1998). Allí expresó:
Orders commanding action or inaction have been denied enforcement in a sister State when they purported to accomplish an official act within the exclusive province of that other State or interfered with litigation over which the ordering State had no authority. Thus, a sister State’s decree concerning land ownership in another State has been held ineffective to transfer title, see Fall v. Eastin, 215 U.S. 1 (1909), although such a decree may indeed preclusively adjudicate the rights and obligations running between the parties to the foreign litigation, see, e.g., Robertson v. Howard, 229 U.S. 254, 261 (1913) (“[I]t may not be doubted that a court of equity in one State in a proper case could compel a defendant before it to convey *315 property situated in another State”). (Énfasis en el original suprimido y énfasis nuestro). íd., págs. 235-236.(3)
Weintraub opina que para romper el círculo de razona-miento que concluye que los tribunales del “non-situs” ca-recen de jurisdicción para disponer sobre el título de tie-rras ubicadas fuera de su jurisdicción, es necesario establecer que el permitirlo
... is so unfair, so inappropriate, so outrageous, as to deprive the party adversely affected of due process of law. One difficulty with such a proposition is that it proves far too much. If this were so, the decree of the non-situs court affecting interests in realty would be void, and recognition of it not only would not be required under the full-faith-and-credit clause, but also would be forbidden as a violation of due process. Weintraub, op. cit., pág. 586.
Por esa razón, algunos tribunales “en el situs del inmue-ble le han dado efectividad de varias maneras a las senten-cias de los tribunales de otras jurisdicciones que afectan el interés sobre el título de las partes que litigan en los tribunales que no son el situs”. (Traducción nuestra). Wein-traub, op. cit., pág. 586 (“[A]t the situs of real estate have given effect in various ways to decrees rendered in other jurisdictions by courts exercising in personam jurisdiction to affect the interest in the realty of the parties before the non-situs courts”).
Los argumentos a favor de la regia del situs se fundamentan en que se protege la integridad y la efectivi- *316 dad de los registros de la propiedad. Sin esta norma, los investigadores de título estarían obligados a analizar leyes foráneas para determinar el efecto de la transmisión y, a su vez, investigar en las cortes de otra jurisdicción si alguna otra litigación existente destruye los intereses de las partes. Por ende, la investigación en los registros de la pro-piedad sería muy costosa y, sobre todo, incierta. Más im-portante aún, con esta regla se protege la norma de que solo el sitio tiene poder sobre sus tierras y, a su vez, se protegen los intereses de los estados en su uso propio y se promueve la libre circulación. Por último, se protegen las expectativas de las partes al prometerse certeza y unifor-midad en los resultados y facilidad de ejecución. Véase Alden, supra, págs. 591-597.
Idénticos fundamentos esboza la profesora Martínez Moya, al afirmar que
[l]as razones principales que, sin embargo, han dado los espe-cialistas para explicar la adopción de la norma lex situs son dos: Primero, como los inmuebles están bajo el control de las autoridades del estado donde están localizados y ninguna de-terminación sobre los mismos puede realizarse sin la partici-pación de tales organismos, es natural y conveniente que cual-quier sentencia que dicte un tribunal extranjero esté fundamentada en la lex situs. De lo contrario, se correría el riesgo de que la sentencia no fuer [a] eficaz en el lugar donde estén localizados los inmuebles. Segundo, es la solución más práctica ya que le brinda una mayor estabilidad a los registros de la propiedad. Las personas pueden consultarlos con la cer-teza de que el tratamiento jurídico de los inmuebles allí regis-trados estará determinado por la lex situs. De lo contrario, las investigaciones de título resultarían muy onerosas y, en con-secuencia, demasiado costosas ya que se tendría que estudiar legislación extraña a la del propio estado donde los inmuebles estén ubicados. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 580.
En Roselló Puig v. Rodríguez Cruz, supra, págs. 104-105, expresamos argumentos similares cuando aseveramos que el Art. 10 del Código Civil, supra, incorporó el principio general del derecho estadounidense respecto a *317 que los bienes inmuebles se regulan totalmente por la ley del lugar en que estén sitos. Manifestamos que
... en el derecho estadounidense se le da gran énfasis al hecho de que la propiedad inmueble se rige única y exclusiva-mente por las leyes del estado en que esté sito el inmueble. Ello evita que surjan conflictos entre estados hermanos en re-lación con la ley que deba aplicarse respecto a las propiedades inmuebles sitas en éstos. Además, propicia un ambiente de mutua deferencia respecto al dominio y la soberanía de éstos sobre el bien en cuestión, a la vez que promulga la aplicación uniforme de las leyes a todas las propiedades inmuebles en un mismo territorio. A su vez, introduce un alto grado de previsi-bilidad, al mismo tiempo que refleja el control que el estado puede ejercer sobre los bienes que se encuentran en su territorio. Es claro que el estado en el que está ubicado el inmueble posee un interés particular sobre éste en vista de que precisamente esa propiedad es inamovible. Roselló Puig v. Rodríguez Cruz, supra, págs. 105-106. Véase, además, 2 Restatement of the Law Second, Conflict of Laws 2d Sec. 222 (1971).
Amerita señalar que la regla del situs ha recibido mu-chísimas críticas por parte de los tratadistas que han estu-diado el tema. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, págs. 597-598. Véase, además, Weintraub, op. cit., Cap. 8. Los trata-distas también consideran que, aunque en ciertas ocasio-nes la regla es conveniente si se trata de la protección de compradores bona fide o del uso apropiado de las tierras, en ocasiones no es pertinente. Proponen una aplicación menos mecánica de la regla, que se circunscriba a analizar si el interés estatal para su aplicación es conveniente en la situación particular que se presente. Según esa filosofía, los límites modernos en la jurisdicción de un tribunal están dirigidos a proteger a las personas, no a las tierras o a los intereses estatales en ellas. Íd.
Por último, algunos estados utilizan la ficción doctrinal del “equitable conversion” (doctrina de la conversión) para escapar de los efectos del sistema germánico de fragmentación. Con esa doctrina se
*318 ... subsume a los inmuebles bajo la categoría de bienes mue-bles, lográndose así que la masa hereditaria se conciba como una universalidad regida por la ley del último domicilio del causante. Esta ficción se utiliza casi siempre en aquellos casos en que el causante, a pesar de dejar bienes inmuebles en dis-tintos estados, dispone que los mismos sean vendidos para satisfacer la participación de sus herederos. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 582. Véase, además, Weintraub, op. cit., pág. 595-598.
B. Conflicto de leyes en el ámbito sucesoral puertorriqueño El primer caso en el que este Tribunal tuvo que diluci-dar el alcance del Art. 10 del Código Civil, supra, fue Hecht v. Hecht et al., supra. El Sr. Felipe Hecht era un ciudadano puertorriqueño domiciliado en Ginebra, Suiza. Como parte de su patrimonio, tenía bienes en Suiza y en Puerto Rico. Antes de su muerte, otorgó varios testamentos mancomu-nados en la Isla, junto con su esposa. En el último de ellos, el matrimonio instituyó como herederos universales a sus cuatros hijos. Por su parte, el señor Hecht reconoció a Margarita Hecht como hija.
Al morir el señor Hecht, su hija Margarita instó un pleito contra la sucesión de su padre. Argüyó que el último testamento la privaba de la legítima forzosa que nuestro ordenamiento jurídico le garantizaba como hija. Luego de varios trámites procesales, la sucesión demandada pre-sentó un escrito en que solicitaron que la controversia se circunscribiera a los bienes existentes en Puerto Rico, por-que los tribunales de la Isla carecían de jurisdicción para decidir sobre los bienes inmuebles sitos en Suiza. Este Tribunal, amparándose en la corriente romana universalista, expresó que
[e]l haber hereditario, sean cuales fueren los elementos que lo integran, constituye una sola masa, y no puede liquidarse y partirse, incluyendo en esas operaciones unos bienes y exclu-yendo otros. Los derechos que sobre esa masa asistan a la demandante doña Margarita Hecht no pueden definirse y de-terminarse, teniendo en cuenta únicamente los bienes heredi-tarios existentes en Puerto Rico, con exclusión de los que exis- *319 tan en el extranjero, pues se dividiría así la continencia del negocio con perjuicio de sus derechos. Hecht v. Hecht et al., supra, pág. 237.
Añadimos que aunque no se hubiera traído al juicio prueba sobre la legislación vigente en Suiza para casos de derecho sucesorio con elementos de derecho internacional privado, “esa omisión, sea cual fuere su trascendencia, no p[odía] perjudicar la integridad de los derechos que asist[ía]n a doña Margarita Hecht sobre los bienes de su difunto padre”. Íd., pág. 237. Señalamos
... que existiendo bienes inmuebles pertenecientes a la he-rencia radicados en país extranjero, en todo lo que sea necesa-rio se aplique para la práctica de las operaciones testamenta-rias las leyes del país en donde dichos bienes están situados. Si las leyes de Suiza prohíben la adquisición por un extranjero de bienes raíces allí situados, o limita la extensión de la ad-quisición, hablamos en mera hipótesis, tales leyes deben ser respetadas, por ser principio general de derecho internacional privado, basado en el concepto de soberanía de un Estado, sea cual fuere éste, que la jurisdicción de los tribunales de otro Estado no puede afectar los bienes raíces en aquél situados, Íd., págs. 237-238.
Sin embargo, acto seguido pronunciamos que
... ese principio no arguye falta de jurisdicción en la corte sen-tenciadora para ordenar que en la fijación de los derechos he-reditarios de doña Margarita Hecht se tenga en cuenta la masa total de bienes que dejara su difunto padre, pues al pro-ceder así no dispone que determinados bienes raíces se adju-diquen a la demandante, y no extiende, por tanto, su acción de un modo concreto a bienes situados en país extranjero. En el presente caso no se trata de la posesión o propiedad de bienes raíces o inmuebles, sino de la distribución del as hereditario de don Felipe Hecht, que comprende el conjunto o universali-dad de todos los bienes relictos por el mismo. Íd., pág. 238.
Como puede notarse, aunque reconocimos que “en todo lo que sea necesario se aplique para la práctica de las ope-raciones testamentarias las leyes del país en donde dichos bienes están situados”, acto seguido afirmamos que “en la *320 fijación de los derechos hereditarios... se tenga en cuenta la masa total de bienes [pues] no se trata de la posesión o propiedad de bienes raíces o inmuebles, sino de la distri-bución del as hereditario de don Felipe Hecht, que com-prende el conjunto o universalidad de todos los bienes re-lictos por el mismo”. Íd., págs. 237 y 238. Sin lugar a dudas, esa afirmación ignoró la corriente germánica que caracteriza la letra del Art. 10 de nuestro Código Civil, supra, en cuanto a controversias de derecho sucesorio en el campo del derecho internacional privado.
Diez años más tarde, este Tribunal aparentó abandonar la postura romano-universalista en Bracons v. Registrador de San Juan, supra. En ese caso, el Sr. Salvador Baví Du-rall otorgó un testamento en Barcelona, España, en el que declaró que era catalán; “que la sucesión de sus bienes de-bía regularse por la legislación catalana; que legaba a su hijo Salvador Baví Bracons y a los demás que pudiera te-ner en el momento de su muerte, la cantidad que en con-cepto de legítima les correspondiera, y que de todos sus restantes bienes, muebles e inmuebles, derechos y acciones presentes y futuros, tanto de los radicados en España como de los que poseyera en Puerto Rico, o en cualquier otro punto, nombraba su heredera universal a su esposa Rosa Bracons y Vidal la cual podría disponer de dicha herencia a sus libres voluntades”. Bracons v. Registrador de San Juan, supra, pág. 754.
Cuando el señor Baví Durall falleció, su viuda acudió al Registro de la Propiedad de San Juan para solicitar que se inscribiera a su nombre una casa ubicada en la Calle Tanca de ese municipio. Para ello, la señora Bracons y Vidal presentó en el Registro de la Propiedad los documentos correspondientes para la inscripción del inmueble a su nombre, junto con una consulta efectuada a un abogado español que pormenorizó los derechos que le correspondían a la viuda. El Registrador, tras verificar la información provista, inscribió únicamente “en cuanto a la tercera *321 parte de la casa en cuestión y la negó en cuanto a las dos terceras partes restantes...”. Bracons v. Registrador, supra, pág. 755. Fundamentó su decisión así:
“1. Que el causante legó a su hijo Don Salvador Baví Bra-cons y a los demás que tuviera la cantidad que en concepto de legítima le correspondiera sobre sus bienes, cuyo legado de legítima, por la muerte del legatario antes que la del testador, quedó sin efecto. 2. Que tratándose de testamento otorgado por un extranjero en su país, en el que se trasmiten bienes inmue-bles radicados en esta isla, es de aplicación el artículo 10 del Código Civil vigente; y debe regularse la cuantía de los dere-chos sucesorios de la heredera Doña Rosa Bracons y Vidal con arreglo a las prescripciones de este código: determinada con-forme al mismo la legítima correspondiente al hijo premuerto como ascendente a las dos terceras partes de la herencia, resta sólo para la heredera instituida la tercera parte de la finca, que es la de libre disposición, según dicho texto [”.] Id.
Inconforme, la señora Bracons presentó un recurso gubernativo. En este adujo que, según la ley del causante —la catalana— cuando un heredero o legatario premuere al testador, la porción que deja vacante acrece la porción del otro coheredero. Por consiguiente, la viuda argumentó que como el hijo premurió a su padre, sus derechos heredi-tarios se aumentaban. Amparados en Colón et al. v. El Registrador, supra, rechazamos la postura de la viuda. Ex-presamos que debía aplicarse la ley de Puerto Rico, ya que con los cambios efectuados al Código Civil en 1902 se “aplic[ó] en Puerto Rico íntegramente la teoría americana, esto es, que la lex rei sitae es la norma que debe seguirse al determinar la capacidad legal de las partes en transaccio-nes sobre bienes inmuebles”. Bracons v. Registrador de San Juan, supra, pág. 757. Así las cosas, concluimos que actuó correctamente el Registrador al inscribir a favor del hijo premuerto las dos terceras partes del inmueble.
Del anterior análisis se aprecia que
... el Tribunal se negó a aplicar la ley nacional del causante y tampoco vio el caudal hereditario del causante como un todo ideal independientemente de donde estuviesen localizados los *322 bienes. Se circunscribió, por el contrario, a aplicar las leyes sucesorales locales al inmueble localizado en Puerto Rico, con total abstracción de los bienes localizados en España. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 577.
Con ese proceder, este Tribunal abrazó la letra clara del Art. 10 del Código Civil, supra, y su acepción germánica. Lamentablemente, la vida de esta norma apenas duró trece lustros, pues en 1982 la abandonamos en Cabrer v. Registrador, 113 D.P.R. 424 (1982).
Allí, la Sra. Mary Marr Chamberlin y el Sr. Wilson Chamberlin, ciudadanos americanos y domiciliados en Westport, Connecticut, eran dueños de un inmueble si-tuado en la Isla. Antes de su muerte, la señora Marr Chamberlin otorgó un testamento en el estado de Connecticut en el que instituyó varios legados y dispuso sobre el inmueble en que residía junto a su esposo en el mencio-nado estado. En el testamento no hizo mención de la pro-piedad que poseía aquí en Puerto Rico.
Posteriormente, la señora Marr Chamberlin falleció. Al amparo de la disposición testamentaria de su difunta es-posa, que le legó el remanente de sus bienes, el viudo con-vino con la Sra. Gladys Cabrer la venta del inmueble loca-lizado aquí. Sin embargo, el señor Chamberlin falleció antes de que se otorgara la escritura de compraventa, por lo que su albacea procedió a otorgar un poder para que se otorgara y así se hizo. Empero, cuando se presentó ante el registro la documentación pertinente para que se inscri-biera el dominio de la propiedad a favor del señor Cham-berlin y de la señora Cabrer, el Registrador se negó tras concluir que el testamento era nulo por preterir a las dos hijas de la testadora.
Luego de una discusión de la figura de la preterición, resolvimos que a las hijas no se les pretirió, pues del tes-tamento surgía que a una se le legó un anillo de diamantes y a la otra el interés de una propiedad y los bienes muebles en ella ubicados. Así pues, concluimos que no se podía de- *323 negar la inscripción bajo el pretexto de que se pudiese le-sionar la legítima de las herederas forzosas, pues estas te-nían a su haber una acción de complemento de legítima. Al razonar de esa forma,
... concebí[mos] el caudal de la causante como una univer-salidad compuesta por todos los bienes independientemente de su naturaleza mueble o inmueble y del lugar de su ubicación. O, lo que es igual, como se les dejó parte del caudal relicto no hubo preterición. Esta solución responde a la orien-tación romano-unitaria que concibe el patrimonio como una universalidad, no importa el lugar de ubicación de los bienes. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 600.
Evidentemente, con ese razonamiento volvimos a alejar-nos del Art. 10 del Código Civil, supra, pues de haber apli-cado el modelo germánico debimos resolver
... que a la muerte de la testadora habían surgido varias ma-sas sucesorales o patrimonios separados: uno correspondiente a los muebles el cual será gobernado por la ley del último domicilio del causante y otros diferentes en los distintos luga-res donde hubiese inmuebles los cuales estarían regidos por la lex situs. A la luz de esa orientación el inmueble localizado en Puerto Rico formaría un patrimonio separado del resto de los bienes sobre el cual se aplicaría nuestro régimen de legítimas. Para que se entendiera que no había habido preterición, se les hubiese tenido que dejar a las hijas una participación en el inmueble de Humacao. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 600. Véanse, además: Martínez Moya, El derecho sucesorio puertorriqueño, supra, pág. 87; Dávila Rivera, supra, pág. 18.
La anomalía del caso Cabrer v. Registrador, supra, es-triba en que aun cuando analizamos la controversia a la luz del crisol del sistema romano-unitario, aplicamos la ley de Puerto Rico para regular el contenido del testamento. Lo correcto debió ser que, al concebir la sucesión como una unidad, aplicáramos la ley de Connecticut, que era la del último domicilio de la causante. Véanse: Martínez Moya, El derecho sucesorio puertorriqueño, supra, pág. 87; Dávila *324 Rivera, supra, pág. 18; Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 600.
Recientemente este Tribunal tuvo la necesidad de aden-trarse en este campo al resolver Roselló Puig v. Rodríguez Cruz, supra. Allí tuvimos la encomienda de analizar si, conforme al estatuto formal de nuestro Código Civil, a saber, el Art. 11, supra, surtía efectos en nuestra jurisdicción un contrato suscrito en el estado de Florida por unos cón-yuges puertorriqueños que, sujetos al régimen de Sociedad Legal de Gananciales, transfirieron a uno solo de ellos la titularidad exclusiva sobre un bien inmueble sito en ese estado. Tras sostener la viabilidad del acto jurídico efec-tuado en el estado de Florida, reconocimos el carácter pri-vativo de la propiedad sita en el estado de Florida. Sin embargo, cabe precisar que en ningún momento adjudica-mos el título de esa propiedad. Por el contrario, en confor-midad con la regla del situs estatuida en nuestro Art. 10, supra, aceptamos como un hecho indubitado el título de propiedad que ya venía del estado de Florida, al momento de analizar la controversia. Por ello, desacierta la opinión disidente cuando afirma en la nota al calce 34 que en Roselló Puig v. Rodríguez Cruz, supra, “[n]o se contempló que los tribunales de Puerto Rico no tuvieran jurisdicción para determinar a cuál de los excónyuges le pertenecía el bien inmueble sito en Florida que generó la disputa durante la división de bienes gananciales”. Opinión disidente, pág. 345 esc. 34. A modo de recapitulación, amerita enfatizar que en Roselló Puig v. Rodríguez Cruz, supra, ya había un título adjudicado. Lo que hicimos fue validar un negocio jurídico conforme las leyes donde el inmueble ubicaba.
Con el beneficio del marco doctrinal reseñado, pasemos a analizar la controversia que hoy nos ocupa.
*325 V
En su alegato ante este Tribunal, los peticionarios afir-man que “una vez probado que don Alfonso era propietario de bienes inmuebles sitos en la República Dominicana, procede que el TPI dictamine que los mismos forman parte de su caudal y practique su partición y adjudicación final de los mismos [sic] entre sus co-herederos, Doña Ginette y la sucesión de don Wallace según corresponda”. (Enfasis suprimido). Solicitud de certiorari, pág. 11. Fundamentan su contención en nuestros pronunciamientos en Hecth v. Hecht et al., supra, a los efectos de que la herencia consti-tuye una sola masa hereditaria, independientemente de donde están sitos los bienes que la integran. Por ello no puede liquidarse y partirse incluyendo en esas operaciones unos bienes y excluyendo otros. Solicitud de certiorari, pág. 13. No tienen razón.
El pronunciamiento que hicimos en Hecht v. Hecht et al., supra, pág. 237, en cuanto a que el haber hereditario “constituye una sola masa, y no puede liquidarse y partirse, incluyendo en esas operaciones unos bienes y ex-cluyendo otros”, es correcto si el causante no deja bienes inmuebles fuera de Puerto Rico. Si en la herencia hay bienes inmuebles en otra jurisdicción, entra a escena el Art. 10 del Código Civil, supra, y su visión germánica.
Los peticionarios nos invitan a aplicar en este caso la doctrina del forum non conveniens recientemente incorporada en nuestro ordenamiento jurídico procesal en Ramírez Sainz v. S.L.G. Cabanillas, supra. Amparándose en los pronunciamientos de ese caso, arguyen que “[n]o existe... impedimento para que nuestros tribunales apliquen las leyes de países extranjeros, en este caso las de la República Dominicana”. Solicitud de certiorari, pág. 14. Sostienen que resulta oneroso requerir a los herederos que en los casos en que un causante haya dejado bienes en *326 distintos países, tengan que iniciar un procedimiento sepa-rado y aislado para su partición en cada uno de los países donde ubiquen bienes inmuebles. No les asiste la razón. Sabido es que “antes de analizar si procede acoger una moción de forum non conveniens, el Tribunal de Primera Instancia está obligado a constatar que efectivamente tiene jurisdicción y competencia sobre las partes y la materia”. Ramírez Sainz v. S.L.G. Cabanillas, supra, pág. 38. Es decir, la doctrina del forum non conveniens presu-pone la existencia de jurisdicción por ambos foros (“The application of the forum non conveniens doctrine presupposes the existence of jurisdiction on behalf of the court”). (Citas omitidas). M. Karayanni, Forum Non Conveniens in the Modern Age: A Comparative and Methodological Analysis of Anglo-American Law, Nueva York, Ed. Transnational Publishers, 2004, pág. 21. Véase, además, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947).
La regia del situs recogida en nuestro Art. 10, supra, no solo controla la ley que se aplicará, sino también la jurisdicción de los tribunales para adjudicar las controversias. Al ser así, los tribunales de Puerto Rico no ostentan jurisdicción extraterritorial, por lo que no procede la aplicación a este caso de la doctrina de forum non conveniens. Es decir, nuestros tribunales no tienen autoridad para atender acciones legales sobre la titularidad de bienes inmuebles que un causante deja en otro país. Ese fue el efecto de la enmienda introducida al Art. 10 del Código Civil, supra, en 1902.
Por consiguiente, cuando un ciudadano domiciliado en Puerto Rico deja bienes en el extranjero, se abrirán diferentes masas de bienes dependiendo de su categoría, a saber, inmuebles o muebles. Cuando se trate de bienes muebles, estos se regirán por la ley del último domicilio del causante. Lokpez v. Fernández, 61 D.P.R. 522 (1943). Por el contrario, cuando se trate de bienes inmuebles —como ocurre aquí— se abrirán diferentes masas su- *327 cesorales dependiendo de los lugares en los que ubiquen, y cada una de ellas se regirá por la lex situs. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, supra, pág. 594.
Con ese escenario, en primera instancia el tribunal en donde ubica el inmueble debe emitir su dictamen sobre la titularidad de ese bien. Luego de eso, nuestros tribunales deben tomar conocimiento judicial del dictamen que emitió el foro con jurisdicción sobre la propiedad inmueble y com-putarle un valor en la masa hereditaria. Para convalidar la sentencia en su día, se tomará en consideración lo dis-puesto en la Regla 55 de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V, sobre exequátur. De igual forma, el valor que se le adjudique al bien inmueble en la masa heredita-ria dependerá de la prueba que las partes presenten al respecto.
La postura que adoptamos hoy ya fue pensada en el pasado. Precisamente, el profesor suizo de derecho inter-nacional, Atle Grahl Madsen, avala lo que aquí se resuelve como una posible solución a la injusticia que puede surgir cuando la ley del lugar en el que se encuentre el inmueble beneficia a un heredero sobre otro. Sobre el particular, se-ñala:
Tendremos que aceptar que los bienes inmuebles ubicados fuera de la tierra natal del difunto serán devueltos a todos aquellos sucesores de acuerdo al lex situs, pues ya a este punto, la ley personal del difunto no tiene poder alguno.
La incógnita que permanece es si el beneficio que tienen ciertas personas bajo el lex situs deberá ser compensado en conexión con la distribución de la propiedad bajo el dominio de la ley personal. Se pueden pensar tres soluciones a este problema.
(1) La herencia sujeta a la ley personal del difunto es dis-tribuida sin tomar en cuenta el bien inmueble que está ubi-cado en el extranjero, esto significa la aceptación de la escisión.
(2) El bien inmueble ubicado en el extranjero se incluye dentro de los activos de la sucesión. Ciertamente, este debe ser “distribuido” a todos aquellos herederos de acuerdo al lex situs, *328 pero su valor debe deducirse de las partidas de aquellos here-deros de la propiedad que se halla bajo la ley personal, en la medida en que sea posible. Esto implica la modificación del principio de sucesión universal (o unitaria) y el resultado es comparable a lo que conduzca la doctrina de elección.
(3) No nos limitamos a deducir el valor de los bienes inmue-bles ubicados en el extranjero de las partidas de la propiedad bajo ley personal, sino que también le concedemos a los here-deros una acción por compensación para el beneficio que los herederos han tenido bajo la lex situs, por encima del valor de dichas partidas. Esto significaría tratar de aplicar el principio de sucesión universal (o unitaria) sin moderación alguna. (Traducción nuestra y escolio omitido). A. Grahl-Madsen, Conflict Between the Principle of Unitary Succession and System of Scission, 28 Int’l & Comp. L.Q. 598, 607 (1979).(4)
Por consiguiente, con la adopción de esta solución se evita la injusticia que podría surgir si en la jurisdicción donde se ubica el inmueble del causante se le adjudica a uno o más herederos una porción mayor a la que le corres-pondería según el régimen de legítimas que dispone nues-tro sistema sucesoral. Además, brindamos uniformidad a nuestra jurisprudencia antes mencionada, que visualiza la sucesión mortis causa bajo la óptica del sistema romano.
*329 Enfatizamos que la norma anterior aplicará únicamente en los casos en que el último domicilio del causante sea Puerto Rico. Cuando el causante estuvo domiciliado en otra jurisdicción al morir, los bienes muebles también se adjudicarán conforme a la ley de esa jurisdicción. Art. 10 del Código Civil, supra.
En vista de lo anterior, concluimos que los tribunales de Puerto Rico carecen de jurisdicción para adjudicar la titularidad de los alegados bienes inmuebles que el señor Valencia Jiménez dejó en la República Dominicana. En el caso que nos ocupa, corresponde presentar un pleito en los tribunales de ese país para que se determine la titularidad de los alegados bienes inmuebles que el señor Valencia Jiménez pudo dejar en la isla vecina. Sobre ese dicta-men nuestros tribunales tomarán conocimiento judicial y le adjudicarán un valor al bien inmueble en controversia en la masa hereditaria conforme a la prueba sobre su valor que traigan las partes.
Se argumenta que este proceso es oneroso e inefectivo. Lo que debemos preguntarnos es si acaso no será oneroso para los tribunales de Puerto Rico tener que interpretar la ley de otra jurisdicción, en este caso, la de un país extranjero. A lo anterior hay que sumarle las múltiples controversias que se suscitarán cuando una de las partes no esté de acuerdo con la interpretación que nuestros tribunales le den a esa ley extranjera. Es evidente que ese proceso dilatará los procedimientos y conllevará costos para las partes.
VI
A. Como segundo señalamiento de error, el matrimo-nio Valencia-Catinchi aduce que el Tribunal de Apelaciones los privó de presentar en evidencia lo que se pueda obtener en el descubrimiento de prueba. Según ellos, eso impediría *330 que se determine cuáles bienes serán traídos a la masa hereditaria. No nos convencen.
Las reglas que rigen el descubrimiento de prueba “se basan en el concepto básico de que antes del juicio toda parte en la litigación tiene el derecho a obtener el descubrimiento de toda la información que esté en posesión de cualquier persona”. J.A. Cuevas Segarra, Tratado de derecho procesal civil, 2da ed., San Juan, Pubs. J.T.S., 2011, T. III, pág. 835. “[U]n amplio y liberal descubrimiento de prueba es la médula del esfuerzo de destruir de una vez y para siempre la deportiva teoría de justicia que tanto mina la fe del pueblo en el sistema judicial”. Id. Véanse, además: Rivera Alejandro v. Algarín, 112 D.P.R. 830 (1982); Ortiz v. E.L.A., National Ins. Co., 125 D.P.R. 65 (1989). Las reglas que encaminan el descubrimiento de prueba procuran “que el juicio sea menos un juego de la gallinita ciega y más una contienda justa en que los hechos sean descubiertos en la más amplia extensión posible. La justicia no es un juego, ni un deporte, sino una empresa formal a ser conducida seriamente”. Cuevas Segarra, op. cit., pág. 836.
En reiteradas ocasiones hemos dicho que “para que una materia pueda ser objeto de descubrimiento, basta con que exista una posibilidad razonable de relación con el asunto en controversia”. Rodríguez v. Scotiabank de P.R., 113 D.P.R. 210, 212 (1982). Véase Medina Morales v. M.S. & D. Química P.R., Inc., 135 D.P.R. 716 (1994). Por esa razón, “[c]ualquier duda en cuanto a la pertinencia, debe resolverse a favor de ésta. Existe una presunción favorable al descubrimiento de prueba”. Cuevas Segarra, op. cit., pág. 840. “El concepto de pertinencia tiene que interpretarse de manera cónsona con el principio rector de las reglas procesales; lograr la solución de las controversias de forma justa, rápida y económica”. Id., pág. 841.
*331 La Regla 23.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, dispone que
[e]l alcance del descubrimiento de prueba, a menos que sea limitado de algún modo por el tribunal, en conformidad con las disposiciones de estas reglas, será como sigue:
(a) En general. — Las partes podrán hacer descubrimiento sobre cualquier materia, no privilegiada, que sea pertinente al asunto en controversia en el pleito pendiente, ya se refiera a la reclamación o defensa de cualquier otra parte, incluso la exis-tencia, descripción, naturaleza, custodia, condición y localiza-ción de cualesquiera libros, información almacenada electróni-camente, documentos u otros objetos tangibles y la identidad y dirección de personas que conozcan hechos pertinentes. No constituirá objeción el que la información solicitada sea inad-misible en el juicio, siempre que exista una probabilidad razo-nable de que dicha información conduzca al descubrimiento de evidencia admisible.
“El propósito de esta liberal norma de descubrimiento de prueba es que aflore la verdad de lo ocurrido, evitando así los inconvenientes, sorpresas e injusticias que surgen cuando las partes ignoran hasta el día de la vista las cues-tiones y los hechos que en realidad son objeto del litigio”. Cuevas Segarra, op. cit., pág. 841. Véase Boitel Santana v. Cruz, 129 D.P.R. 725, 731-732 (1992).
B. En la Resolución de 10 de septiembre de 2009 que emitió el Tribunal de Primera Instancia, lo que ese foro determinó fue que: (1) solo se tomaría en consideración el caudal existente al momento del fallecimiento del señor Valencia Jiménez; (2) que no permitiría el desfile de prueba de eventos acaecidos antes de la muerte del señor Valencia Jiménez, y (3) que tienen que dilucidarse en plei-tos separados las controversias sobre los activos de las cor-poraciones que forman parte del caudal que pudieron ser apropiadas por el señor Valencia Mercader.
Por su parte, el Tribunal de Apelaciones determinó que “se modifica la Resolución y Orden emitida por el TPI el 10 de septiembre de 2009, a los únicos efectos de que se per- *332 mita un descubrimiento de prueba amplio y liberal con-forme a lo dispuesto en esta Sentencia”. Sentencia del Tribunal de Apelaciones, pág. 27; Apéndice de la Solicitud de certiorari, pág. 1959. Una lectura de la resolución del foro primario deja claro que el foro apelativo intermedio revocó su determinación referente a que no permitiría el desfile de prueba de eventos acaecidos antes de la muerte del se-ñor Valencia Jiménez. Por ello permitió un descubrimiento de prueba amplio y liberal sobre aquello que tenga una posibilidad razonable de relación con el asunto en controversia. De no ser así, ¿qué propósito tendría permitir el descubrimiento de esa prueba? Claro está, la admisibili-dad de esa prueba en el juicio estará sujeta a los criterios de las Reglas de Evidencia. Véase Reglas 401-403 de Evi-dencia, 32 L.P.R.A. Ap. VI. Por todo lo anterior, concluimos que, sujeto al cumplimiento con las Reglas de Evidencia, procede la presentación durante el juicio de la evidencia producto del descubrimiento de prueba previo al deceso del señor Valencia Jiménez.
Por último, concluimos que es correcta la alegación de los peticionarios en cuanto a que, de probarse que el señor Valencia Mercader sustrajo bienes del patrimonio de su padre, su valor se debe imputar como adelanto de su legítima, aunque los obtuviera de una de sus corporaciones. Solicitud de certiorari, pág. 19. No vemos razón para que en el mismo pleito, como parte del descubrimiento de prueba, se indague acerca de las transacciones alegadas de fraude entre las corporaciones del señor Valencia Jiménez y Valencia Mercader. En el mismo pleito de partición de herencia se pueden dilucidar las reclamaciones de reivindicación de bienes que los herederos tengan entre sí. Ello incluye las alegadas transacciones fraudulentas entre las corporaciones Valencia Shipping Agencies (Valencia Mercader) y Sea-Land of Puerto Rico (Valencia Jiménez).
*333 Claramente el foro primario erró al determinar que no procedía el descubrimiento ni la presentación de prueba de los actos anteriores a la muerte del señor Valencia Jiménez. Resulta evidente que si este caso versa sobre una acción de complemento de legítima, es pertinente descubrir los actos anteriores a la muerte del causante que la pudie-ron haber afectado. Véanse: Regla 401 de Evidencia, supra; Arts. 578, 692, 735, 747 y 989 del Código Civil, 31 L.P.R.A. sees. 2023, 2281, 2361, 2373 y 2841. Claro está, la deter-minación de si procede o no el complemento de legítima se debe tomar luego, tras un juicio en su fondo en el que las partes tengan su día en corte. Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881, 888-889 (1993). Así pues, también es incorrecta la alegación de los recurridos de que si los peticionarios probaran una disminución en el patri-monio del señor Valencia Jiménez a favor del señor Valencia Mercader, a través de la transferencia de bienes corpo-rativos del caudal, procedería una acción derivativa mediante un pleito independiente. Eso se puede dilucidar en este litigio.
VII
Por los fundamentos antes expuestos, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta disintió con una opinión escrita, a la que se unieron el Juez Presidente Se-ñor Hernández Denton y la Juez Asociada Señora Rodrí-guez Rodríguez. La Jueza Asociada Señora Pabón Char-neco no intervino y el Juez Asociado Señor Feliberti Cintrón no interviene.

*334
— o —

 “Sec. 2090. Herencia, definición de
“La herencia comprende todos los bienes, derechos y obligaciones de una persona, que no se extingan por su muerte”.

 Ya en 1960 Mirabal Conde previo las injusticias que se evitaron con la elimi-nación del segundo párrafo del Art. 10 del Código Civil, 31 L.P.R.A. sec. 10. A esos efectos señaló que
“[e]l desarrollo de la teoría territorial en Puerto Rico ha impedido ciertas solu-ciones que hubiesen resultado injustas y que, bajo otras circunstancias en otras épocas, podrían haberse justificado por medio de doctrinas abstractas. Una reintro-ducción de la primitiva redacción del Artículo 10, podría llevarnos a situaciones completamente faltas de justicia integral. Por ejemplo, un ciudadano de Estados Unidos domiciliado en cualquier Estado de la Unión (ya sea ‘americano’ o ‘puertorri-queño’) podría impunemente desheredar a su hijo legítimo en Puerto Rico. Esta ha sido la realidad en otras jurisdicciones donde aún impera este precepto en su forma original. Así vemos cómo en las Islas Filipinas un causante domiciliado en Illinois puede válidamente excluir de su herencia a un hijo legítimo aun cuando las leyes Filipinas no lo permitieran. Este resultado está obviamente reñido con la clara orien-tación social que se ha dado a nuestro derecho en los últimos años. También, de reintegrarse al derecho puertorriqueño, podría tener resultados contraproducentes si consideramos la creciente comunidad de intereses entre Puerto Rico y los diferentes *308 Estados de la Unión norteamericana”. (Escolios omitidos). R.A. Mirabal Conde, La regla “lex rei sitae” en la doctrina puertorriqueña de conflicto de leyes, 30 Rev. Jur. U.P.R. 57, 74-75 (1961).

 La opinión disidente correctamente percibió que en el caso Robertson v. Howard, 229 U.S. 254 (1913), se determinó que la Corte de Quiebras en un estado tenía jurisdicción para ordenar la venta de propiedades en otro estado por el tipo de litigio que se trató, a saber, un caso de quiebra. Las controversias de quiebra son de naturaleza particular, razón por la cual el Congreso de Estados Unidos creó una corte con jurisdicción única para atender esos casos. Por eso es incorrecta la afirma-ción de la disidencia de que la doctrina de lex situs no es imperativa. De la natura-leza misma de la decisión del Tribunal Supremo de Estados Unidos, a los efectos de que los tribunales de un estado no tienen jurisdicción sobre la materia para transfe-rir título sobre bienes inmuebles ubicados en un estado hermano, se infiere su ca-rácter obligatorio. Dudamos que esa norma diáfana pueda catalogarse como mera-mente directiva. Y es que lo que está enjuego es vital: se trata de la soberanía de los estados sobre su territorio.

 “We shall have to accept that the immovable property outside the deceased’s homeland will devolve upon those who are successors according to lex situs, for on this point the personal law of the deceased is powerless.
“The question which remains is whether the benefit which certain persons have under the lex situs shall be compensated in connection with the distribution of the property which is under the dominion of the personal law. There are three thinkable solutions to this problem:
“(1) The estate which is subject to the personal law of the deceased is distributed without taking the foreign immovable property into account. This means the acceptance of scission.
“(2) The foreign immovable property is included among the assets of the estate. It must certainly be ‘distributed’ to those who are heirs according to lex situs, but its value is deducted from the shares of those heirs in the property which is governed by the personal law, so far as they go. This implies a modification of the principle of universal (or unitary) succession, and the result is comparable to that to which the doctrine of election may lead.
“(3) We do not stop at deducting the value of the foreign real property from the shares of the property governed by the personal law, but we also concede the successors a claim to compensation for the benefit which the heirs have had under lex situs, over and above the value of their said shares. This would mean that we attempt to apply the principle of universal (or unitary) succession without any moderation.” (Escolio omitido).